UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE VA VOCATIONAL REHABILITATION AND EMPLOYMENT OFFICE ASSIGNED TO JAMES E. KING | Misc. No. _____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Katie O'Neil, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Department of Veterans Affairs ("VA"), Office of

Inspector General ("OIG").  I have been employed as a Special Agent since June 2008, assigned

to the Mid-Atlantic Field Office in Washington, DC.  As part of my duties, I investigate felony

violations of law which affect the programs and operations of the VA.

2.      I have successfully completed the Criminal Investigators/Special Agents training

courses at the Federal Law Enforcement Training Center.  Since that time, I have attended various

law enforcement training courses which covered topics to include white-collar crime and fraud

against the government.

3.      Over the course of my career as a Special Agent with VA OIG, I have participated

in many fraud investigations and I have served as the lead or case agent in over 200 cases.  I have

participated in investigations and utilized most traditional law enforcement techniques, including

the drafting and execution of search warrants.

4.      Based on my training and experience, I am familiar with the rules and regulations

governing VA benefits, the methods used to commit benefits-related fraud against the United

States, and the documents and other records that frequently evidence such fraud.

5.      Unless otherwise indicated, the statements contained in this affidavit are based in part on my investigation – including my personal observations and review of records, documents, and other evidence – as well as information provided to me by other investigators and other witnesses.

6.      Because this affidavit is being submitted for the limited purpose of securing authorization for a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that James King, a VA Vocational Rehabilitation and Employment counselor, Albert Poawui, owner of Atius Technology Institute ("Atius"), Michelle Stevens, owner of Eelon Wellness and Massage (also known as Eelon Training Academy) ("Eelon"), Francis Engles, owner of Engles Security Training School ("Engles Security"), and others involved in the operation of Atius, Eelon, and Engles Security have committed and/or are committing violations of 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1001 (False Statements), 18 U.S.C. § 287 (False, Fictitious, or Fraudulent Claims), 18 U.S.C. § 201 (Bribery), 18 U.S.C. §§ 1343 & 1346 (Honest Services Wire Fraud), and 18 U.S.C. § 371 (Conspiracy) (collectively, the "Specified Federal Offenses").  Furthermore, I believe that evidence, fruits, and instrumentalities of these violations, more particularly described in Attachment B to this affidavit (herein incorporated by reference), are presently located at the U.S. Department of Veteran Affairs, 1722 I Street NW, Suite 201, Washington, DC 20006, in the VA Vocational Rehabilitation and Employment office assigned to James King (the "SUBJECT PREMISES").  The SUBJECT PREMISES is more particularly described in Attachment A to this affidavit, which is herein incorporated by reference.

7.      The VA OIG, the Federal Bureau of Investigation ("FBI"), and the Internal Revenue Service-Criminal Investigations are conducting a joint investigation into this matter.  All

information attributed to other agencies or cooperating witnesses has been related to me by them, and is believed to be true and correct.

## LEGAL AUTHORITY & JURISDICTION

8.      Title 18, United States Code, Section 641 provides that whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, any record, voucher, money, or thing of value of the United States or of any department or agency thereof, shall be fined and/or imprisoned as set forth therein.

9.      Title 18, United States Code, Section 1001 prohibits knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation, or making or using any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in a matter within the jurisdiction of the executive, legislative, or judicial branch of the United States Government.

10.     Title 18, United States Code, Section 287 prohibits a person from making or presenting to any department or agency of the United States any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent.

11.     Title 18, United States Code, Section 201 provides that whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official, with intent to influence any official act, and whoever, being a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for being influenced to perform any official act, shall be fined and/or imprisoned as set for therein.

12. Title 18, United States Code, Section 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined and/or imprisoned as set forth therein. Title 18, United States Code, Section 1346 provides that for the purposes of Section 1343, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services by bribery or kickbacks.

13. Title 18, United States Code, Section 371 provides that, if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of this conspiracy, each shall be fined and/or imprisoned as set forth therein.

14. This Affidavit is made in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to search the SUBJECT PREMISES and any computer and storage medium found on the SUBJECT PREMISES. Since the SUBJECT PREMISES is located in District of Columbia, there is jurisdiction in the District of District of Columbia to issue the requested search warrant.

## PROBABLE CAUSE

### Summary of the Fraud Scheme

15. The SUBJECT PREMISES is King's office at the VA, where he met with veterans, communicated with the owners and operators of schools that contracted with the VA, approved invoices, and engaged in other activities to facilitate the fraud scheme.

4

16.     Since 2015, King has been soliciting and receiving bribes from Poawui to take official acts that financially benefit Atius.  Based on an agreement between King and Poawui, King receives seven percent of all payments made by the VA to Atius for the tuition of veterans that King steers to the school in his capacity as a VR&E counselor.

17.     Atius, Eelon, and Engles Security are submitting falsified records to the VA in order to receive unearned payments from the VA for veterans' student tuition and educational equipment. King has facilitated the approval of payments by the VA that are based on these falsified records.

18.     Atius, Eelon, and Engles Security have withdrawn large sums of cash during the relevant time period, during which King has (1) deposited over $40,000 cash into his bank account and (2) paid $30,000 in cash for a Nissan automobile, indicating that King is receiving cash bribes or kickbacks in exchange for his efforts to defraud the VA.

**Veterans Affairs Educational Assistance Under the**
**Vocational Rehabilitation and Employment Program**

19.     Under Title 38, United States Code, Chapter 31, the United States provides eligible veterans with compensable service-connected disabilities all services and assistance necessary to enable them to achieve maximum independence in daily living, to become employable, and to obtain and maintain suitable employment.  *See* 38 U.S.C. § 3100.  VR&E Program benefits are available to individuals who served in the military after September 16, 1940, and did not receive a dishonorable discharge.  *See* 38 U.S.C. §§ 3102(a) and 3225.  In addition, in order to qualify for such benefits a veteran must have a service-connected disability and a serious employment handicap requiring rehabilitation.  *See* 38 U.S.C. § 3102.

20.     A training or rehabilitation facility must meet certain criteria in order to be approved to receive funds under the VR&E Program.  The facility must "[h]ave space, equipment,

5

instructional material and instructor personnel adequate in kind, quality, and amount to provide the desired service for the veteran." In addition, the facility must "cooperate with VA" and "provide timely and accurate information covering the veteran's attendance, performance, and progress in training in the manner prescribed by VA." *See* 38 CFR § 21.294.

21. The VA employs VR&E Program counselors to provide rehabilitation and counseling services to veterans. These services include comprehensive evaluations, entitlement determinations, educational counseling, vocational counseling, rehabilitation planning, job placement, and case management. When a veteran is found to be eligible for the VR&E Program, s/he must attend an orientation and meet with a VR&E Program counselor. The counselor serves as the veteran's first case manager. Each counselor is assigned to a certain number of educational institutions. Once a veteran enrolls at a school, his/her file is transferred to the counselor associated with that school. Approximately 37 VR&E counselors work in the Washington, DC area.

22. The VR&E Program offers various services, to include educational and vocational training. In cases where educational and vocational training is determined to be necessary for the veteran to accomplish the purposes of the rehabilitation program, the VA will pay for tuition, books, supplies, equipment, and other educational costs and fees. *See* 38 U.S.C. § 3104(a)(7)(A). The VA pays the tuition and fees directly to the school on the enrolled veteran's behalf. The VA will either pay the school directly to provide the veteran with books, supplies, and equipment or the VA will make a payment directly to a third-party vendor for these items. In addition, veterans participating in the VR&E Program may receive a subsistence allowance while they pursue an education or training program. The subsistence allowance is a monthly payment calculated based on the rate of attendance in a training program (full-time, three-quarter-time, or half-time), the number of dependents, and the type of training. *See* 38 U.S.C. § 3108(b).

23.     Vendors approved to receive VR&E Program benefits must submit invoices to the appropriate VR&E Program office for approval.  On March 30, 2016, the VR&E Program office in Washington, DC began electronic invoicing which required all vendors to submit invoices to the VR&E Program office by email to a centralized mailbox.  VR&E Program Technicians are responsible for checking the centralized mailbox and delivering the invoices to the appropriate VR&E Program counselor.  VR&E Program counselors are responsible for reviewing these invoices and making a determination as to whether they should be approved or denied.  The VR&E Program rules stipulate that if a veteran's estimated educational costs in a calendar year exceeds $25,000, the VR&E Program counselor "will neither sign a rehabilitation plan nor authorize expenditures before the VR&E Officer approves the program costs."  *See* 38 CFR § 21.430(c).  In this situation, the counselor must submit a high cost memorandum to the VR&E Officer which explains the reasoning for enrolling a veteran in a high cost educational program.  Once approved by a VR&E Officer, the counselor can then authorize expenditures.

24.     Each school in receipt of VA tuition assistance funds must designate a School Certifying Official who is responsible for the certification of beneficiaries of VA education benefits.  School Certifying Officials are required to submit enrollment documents for veterans, keep the VA informed of the enrollment status of veterans, maintain current knowledge of the VA rules and benefits, maintain records of veteran and non-veteran students, and make all records available for inspection at any time by the VA.

25.     School Certifying Officials must complete VA Form 28-1905, Authorization and Certification of Entrance or Reentrance into Rehabilitation and Certification of Status, for each veteran who will receive VA educational assistance funds.  Using this form, School Certifying Officials certify the start and end dates of the veteran's enrollment period and the number of hours

per week the veteran will attend class.  The school also provides the VA with an invoice which indicates the course(s) in which the veteran is being enrolled and the cost of tuition for the course(s).  The School Certifying Official is responsible for notifying the VA of any changes in the information s/he has certified.  If there are no changes to this information, there is no requirement for the School Certifying Official to submit any further documentation to the VA.  However, if a change in enrollment – such as a decrease in a student's hours of class attendance – warrants a decrease in the funds paid to the school, the VA is entitled to – and will – request reimbursement.

26.    It is the VA's policy to terminate payments to any school that is suspected of knowingly providing inaccurate VA Form 28-1905s, and to remove that school from its list of approved vendors.

### Subjects of the Investigation

27.    James King has been employed as a VR&E Program counselor at the National Capital Regional Benefit Office since approximately September 2013.  At that time, King was assigned an office located at 1722 I Street NW, Suite 201, Washington, D.C., and this office has been assigned to him since the time he became employed with VR&E.  King serves as the case manager for veterans enrolled at approximately 20 different schools under the VR&E Program and at any given time, he serves as the case manager for approximately 200 veterans.  Atius, Eelon, and Engles Security are three of the schools assigned to King and King is the case manager for all veterans who enroll at these schools.

28.    In communications with the VA, as well as on publicly-available websites, Atius purports to be a school that provides Information Technology training and instruction to students

from locations in Maryland, Virginia, and Georgia.  A review of VA records and other publicly-available information revealed the following:

    a.    According to Maryland business records, Atius Technology Institute, LLC was first registered on December 15, 2010, and currently maintains a principal office located at 4715 Sellman Road, Suite G, Beltsville, Maryland 20705.  Maryland business records show that Atius Technology Institute, LLC was forfeited on October 1, 2015, and was reinstated on October 11, 2016.  No business records could be located for Atius Technology Institute in Virginia or Georgia.

    b.    VA records identify Atius as a non-accredited non-college degree school.  On December 14, 2014, Atius became an approved vendor with the VA allowing the school to receive VA tuition assistance funds under the VR&E Program for the purpose of providing education and training to eligible veterans.

    c.    According to the publicly-available website for Atius, the school "provides each student with unparalleled knowledge transfer from experienced IT professionals and then prepares each student for Information Technology industry certifications related to each of the classes."  The website states that the school has "20+ certified teachers" and "100% job placement."  It indicates that Atius offers four program tracks including Information Technology Network Engineer, Database Administrator, Cybersecurity Information Assurance, and Project Management Professional.  The website also states that it offers 16 different courses.

    d.    Albert Poawui is the owner of Atius and a VA School Certifying Official, according to VA records.  In his role as a VA School Certifying Official,

Poawui regularly completes and signs VA Forms 28-1905 to certify enrollments for Atius veteran students.  Poawui is also listed as the registered agent for Atius, according to Maryland business records.

e.   Jacob Shodiya is employed by Atius as the Program Director, according to VA records.  In addition, two veterans enrolled at Atius identified Shodiya as an instructor at the school.

f.   Sambo Kanneh is employed by Atius as the head of Human Resources and as the Financial Manager, according to VA records.

29.   In communications with the VA, as well as on publicly-available websites, Eelon purports to be a school that provides training in massage therapy and digital media production.  A review of VA records and other publicly-available information revealed the following:

a.   According to Maryland business records, Eelon Wellness and Massage was first registered on June 9, 2016, and Eelon Training Academy was first registered on June 6, 2016.  Maryland business records indicate that both entities currently maintain a principal office located at 3611 Branch Avenue, Suite 207, Temple Hills, Maryland 20748.

b.   VA records identify Eelon as a non-accredited non-college degree school.  On March 22, 2016, Eelon Wellness and Massage located at 3611 Branch Avenue, Suite 207, Temple Hills, Maryland 20748 became an approved vendor with the VA allowing the school to receive VA tuition assistance funds under the VR&E Program for the purpose of providing education and training to eligible veterans.  At this time, the VA was notified that the school offered wellness and massage courses.  On August 24, 2017, a change was made to the school's

10

vendorization information and the school is now registered with the VA as Eelon Training Academy doing business as Eelon Wellness and Massage. The address associated with the school was changed to 3100 Branch Avenue, Suite 207, Temple Hills, Maryland 20748 and the updated VA records indicate that the school offers courses in audio editing and production, digital media production, and wellness and massage.

c.       According to the publicly-available website for Eelon Training Academy, the school's address is 3100 Branch Avenue, Temple Hills, Maryland 20748. The website states that the school provides "skilled training to our Veterans and transitioning service members" and states that they prepare veterans "with skills for today's market which will enable them to obtain careers in various area of social media marketing." The website states that Eelon Training Academy offers courses in Digital Media Productions including Video Editing, Film Making, Production Guidelines, Computer Basics, and Audio Editing. There is no mention of the school offering wellness and massage courses on this website.

d.       According to the publicly-available Facebook page for Eelon Wellness and Massage, its address is listed as 3611 Branch Avenue, Suite 207, Temple Hills, Maryland 20748. The Facebook page does not indicate that Eelon is a school and there is no mention of digital media production courses. The page states that the school provides "alternative solutions to health and wellness through massage therapy, foot detox, weight management, fitness."

11

     e.     Michelle Stevens is the owner of Eelon, according to Maryland business records and VA records.  In addition, Stevens is a VA School Certifying Official, according to VA records.  In her role as a VA School Certifying Official, Stevens completes and signs VA Forms 28-1905 to certify enrollments for Eelon veteran students.

30.     In communications with the VA, as well as on publicly-available websites, Engles Security purports to be a school that provides security guard training.  A review of VA records and other publicly-available information revealed the following:

     a.     According to Maryland business records, Engles Security Training School, LLC was first registered on December 29, 2016.  According to Virginia business records, Engles and Engles Security Services, LLC was first registered on November 9, 2015.  Maryland and Virginia business records indicate that both entities currently maintain a principal office located at 3611 Branch Avenue, Suite 306, Temple Hills, Maryland 20748.

     b.     VA records identify Engles Security as a non-accredited non-college degree school.  On August 11, 2015, Engles Security located at 3611 Branch Avenue, Suite 306, Temple Hills, Maryland 20748 became an approved vendor with the VA, allowing the school to receive VA tuition assistance funds under the VR&E Program for the purpose of providing education and training to eligible veterans.

     c.     No website could be located for Engles Security.  A publicly-available Facebook page for Engles and Engles Security Services was located.  The "About" section on the Facebook page reads, "Security Guard Services and

Security Guard Training School." The Facebook page indicates that the school is located at 3611 Branch Avenue, Suite 306, Temple Hills, Maryland 20748.

d.    Francis Engles is the owner of Engles Security, according to Maryland business records and VA records. In addition, Engles is a VA School Certifying Official, according to VA records. In his role as a VA School Certifying Official, Engles completes and signs VA Forms 28-1905 to certify enrollments for Engles Security veteran students.

**Review of VA Records**

31.    A review of VA records pertaining to Atius revealed the following:

a.    Albert Poawui completed and signed the vast majority of the VA Forms 28-1905 for veterans enrolled at Atius. Specifically, from 2015 to 2017, Poawui and other Atius staff submitted approximately 130 invoices and approximately 54 VA Forms 28-1905 to certify that 54 veterans were enrolled in and attending Atius between 18 and 40 hours per week.

b.    From September 2015 to April 2017, the VA paid Atius over $2,200,000 for veterans' tuition and equipment. Tuition for Atius ranges between approximately $2,000 and $4,500 per course. Invoices submitted by Poawui and other Atius staff to the VA contain multiple courses and some contain equipment costs ranging from approximately $2,100 to $3,700. On many occasions, Poawui and/or other Atius staff submitted two to three invoices for each veteran student. Each invoice has ranged from approximately $2,100 to $60,000. The total amount charged to the VA for each veteran has ranged from approximately $19,000 to $72,000.

13

    c.    Poawui and/or other Atius staff double-billed the VA for tuition and/or equipment on at least 12 occasions and James King approved all of these invoices for payment.   This resulted in the VA unnecessarily paying approximately $107,000.

    d.    VA records reflect that from 2015 to 2017, the payments to Atius have grown rapidly.   Specifically, for the calendar year 2015, VA paid approximately $44,000 in VR&E benefits.  For the calendar year 2016, VA paid approximately $1,066,000.   In the first four months of calendar year 2017, VA paid approximately $1,175,000.   In addition, nine invoices totaling more than $397,000 have been submitted but have not yet been approved.

    e.    Each veteran enrollee's Atius invoices were totaled.  The tuition and equipment costs for approximately 52 of the 54 veterans exceeded $25,000 in a single calendar year.  James King approved invoices from Atius for approximately 52 veterans that exceeded $25,000 without alerting a VR&E Officer to the high educational costs and he did not complete the high cost memorandums.

    f.    In addition to the monies paid directly to Atius by the VA, from 2015 to 2017, the VA has paid veteran students enrolled at the school under the VR&E Program approximately $687,000 in the form of subsistence allowance.

    g.    There is no record of Atius ever returning funds to the VA.

32.    A review of VR&E Program files and a remote review of James King's government computer revealed records that pertained to Eelon.  The following information was located in those records:

a.     In March 2016, Eelon was approved for VA benefits under the VR&E Program as a school offering courses in wellness and massage therapy.  In or about March 2017, Stevens began submitting invoices to James King requesting payment for digital media production courses and equipment including computers, headphones, and other items.  King approved these invoices for payment.  It was not until August 2017, after the time that VA suspended payments to the school, that Stevens updated the school's VA vendorization information to reflect that it was now operating as Eelon Training Academy doing business as Eelon Wellness and Massage and offering courses in audio editing and production, digital media production, in addition to wellness and massage therapy.

b.     Michelle Stevens completed and signed VA Forms 28-1905 for veterans enrolled at Eelon.  Specifically, from August 2016 to August 2017, Stevens submitted approximately 13 invoices and approximately 8 VA Forms 28-1905 to certify that 8 veterans were enrolled in and attending Eelon between 24 and 32 hours per week.  The VA issued payment for five of these invoices and eight others have not yet been paid.

c.     From August 2016 to April 2017, the VA has paid Eelon over $83,000 for veterans' tuition and equipment.   Tuition for Eelon ranges between approximately $2,370 and $5,750 per course.  Invoices submitted by Stevens to the VA contain multiple courses and they contain equipment costs ranging from approximately $4,200 to $13,925.  On many occasions, Stevens submitted two to three invoices for each veteran student.  Each invoice submitted by Stevens

has ranged from approximately $4,200 to $25,000.  The total amount charged to the VA for each veteran has ranged from approximately $25,000 to $64,000.

d.    Each veteran enrollee's invoices from Eelon Wellness were totaled.  The tuition and equipment costs for at least four veteran enrollees at Eelon exceeded $25,000 in a single calendar year.  James King approved these invoices without alerting a VR&E Officer to the high educational costs and he did not complete the high cost memorandums.

e.    While Eelon has indicated that all veterans are currently enrolled in the school's digital media production program, in some cases, the courses and/or equipment listed on the veterans' invoices are different.  In addition, it appears that the VA may have been overcharged on at least one occasion.  When the individual item costs on veteran A.C.'s equipment and supplies invoice are added they total $6,025 but Eelon billed the VA $9,425 for these items.  In addition, some of the equipment listed on invoices is not listed in the school catalog under the section entitled "Equipment needed for this program."

f.    In addition to the monies paid directly to Eelon by the VA, from 2016 to 2017, the VA has paid veteran students enrolled at the school under the VR&E Program approximately $20,000 in the form of subsistence allowance.

g.    A review of VR&E files associated with veteran enrollees at Eelon revealed that James King's plan of care for these veterans does not follow a logical progression.  King often changes veterans' VR&E Program goals and enrolls veterans in vastly different programs at multiple educational institutions.  For example, in March 2015, King enrolled J.K. at Bladensburg Barber School.

16

Around June 2015, King enrolled veteran J.K. in at least four courses at Engles Security.  Around July 2016, King enrolled J.K. in massage therapy courses at Eelon and King indicated that J.K.'s VR&E Program goal was "to obtain and maintain entry level employment in the occupational goal of a: Health Practitioner Consultant."  Around October 2016, King enrolled J.K. in two additional courses at Engles Security.  Around January 2017, King enrolled J.K. in digital media production courses at Eelon and King changed J.K.'s VR&E Program goal.  The new goal read, "to obtain and maintain entry level employment in the occupational goal of a: Artist, Designers, Illustrators, Graphic Arts."  Records show that VA paid $6,175 for J.K's enrollment at Bladensburg Barber School, $41,600 for J.K.'s enrollments at Engles Security, and $58,300 for J.K.'s enrollments at Eelon.  In addition, J.K. has received approximately $14,000 in subsistence allowance payments.  As further described below, Poawui told me during an interview that J.K. picked up cash bribe payments from Atius staff on King's behalf on numerous occasions.

33.     A review of VR&E Program files revealed records that pertained to Engles Security.  The following information was located in those records:

a.     King initiated the vendorization process for Engles Security in 2015.

b.     Francis Engles completed and signed the vast majority of the VA Forms 28-1905 for veterans enrolled at Engles Security.  Specifically, from August 2015 to November 2016, Engles and/or other Engles Security staff submitted approximately 55 invoices and approximately 15 VA Forms 28-1905 to certify that 15 veterans were enrolled in and attending Engles Security.

17

    c.    From August 2015 to November 2016, the VA paid Engles Security over $342,000 for veterans' tuition.  Tuition for Engles Security ranges between approximately $1,500 and $8,000 per course.  On many occasions, Engles and/or Engles Security staff submitted more than one invoice for each veteran student.  For example, Engles and/or Engles Security staff submitted seven invoices for veteran K.P.  The total amount charged to the VA for each veteran has ranged from approximately $18,400 to $35,425.

    d.    Each veteran enrollee's Engles Security invoices were totaled.  The tuition for approximately 2 of the 15 veterans exceeded $25,000 in a single calendar year.  James King approved these invoices without alerting a VR&E Officer to the high educational costs and he did not complete the high cost memorandums.

    e.    In addition to the monies paid directly to Engles Security by the VA, from 2015 to 2017, the VA has paid veteran students enrolled at the school under the VR&E Program approximately $61,606 in the form of subsistence allowance.

34.    A review of James King's government email account was conducted. This review revealed the following:

    a.    From November 2016 to October 2017, James King exchanged more than 150 messages with individuals associated with Atius to include Albert Poawui, Jacob Shodiya, and Sambo Kanneh.

    b.    Poawui and Shodiya sent multiple emails to King's VA email address with attached invoices for veteran students enrolled in the VR&E Program despite the fact that schools are required to submit invoices by email to a centralized VR&E mailbox – not a particular VA counselor.

c.    King used a personal email account to communicate with Poawui about official VA business.  For example, King sent an email from his personal email account to Poawui which included feedback he received from a student enrolled at.  In the email, the student expresses frustration with his/her experience at Atius Technology Institute and states, "Since attending Atius, I have not received a book prior to class or even on the first day of class. The textbooks have always arrived late and in some cases aren't even the books that the instructor taught from."  The student goes on to state, "Class has already been cancelled once," and "the class start time was changed."

d.    King received an email with the subject line, "Marketing Strategies for Atius" from another VR&E counselor and the body of the message reads, "Come and see me."  King forwarded this email to his personal email account and the body of the forwarded email reads, "KEEP."

e.    Some of King's email exchanges discussed veteran enrollees' attendance at Atius, but no corresponding attendance rosters could be found in the VA's records.

f.    King also received an invitation to Poawui's birthday party which was scheduled for January 21, 2017.

g.    From January 2017 to October 2017, King exchanged approximately 86 messages with Michelle Stevens and/or email addresses associated with Eelon. Approximately 17 emails relating to Eelon were sent to personal email accounts associated with King.  Many of these emails were sent directly from email addresses associated with Eelon to King's personal email accounts and others

were forwarded by King to his personal email accounts.  Many of the email messages that are sent to King's personal accounts include attached invoices for veteran students and VA Forms 28-1905 pertaining to veterans in the VR&E Program.  In one email sent to King's government email account from an email account associated with Eelon, a veteran's tuition is split between three invoices, apparently in an attempt to avoid VR&E additional authorization requirements.  King then forwarded these invoices to two of his personal email accounts.

h.      From December 2016 to October 2017, King exchanged approximately 18 messages with Francis Engles and/or email addresses associated with Engles Security.  In one instance, King forwards an email message from Engles to two of his personal email accounts.

35.      On August 22, 2017, a site visit was conducted by a VR&E Program staff member at Atius Technology Institute located at 6320 Augusta Drive, 12th Floor, Springfield, Virginia 22150.  The following information was gathered during this site visit:

a.      The VR&E Program staff member met with Albert Poawui, Jacob Shodiya and Sombo Kanneh.  They each described their role at Atius.  Poawui identified himself as the owner, Shodiya identified himself as the program director, and Kanneh indicated she was responsible for bookkeeping.

b.      The VR&E Program staff member was provided a tour of the school where s/he observed two classrooms with 12 computers on tables which Atius staff indicated were used by students.  There was a supply room with numerous

laptop and desktop computers which Poawui said are used for "hands-on instruction."

    c.    Poawui reported that Atius offers four training programs including Network Engineer, Cybersecurity Analyst, Database Administration, and Project Management Professional. Poawui said Atius's training program takes approximately 18 months to complete. Upon completion, Poawui said students are awarded a certificate of completion.

    d.    Kanneh was identified as the person responsible for maintaining the financial records. Kanneh oversees the invoices issued to the VA for training, examinations, equipment, and supplies. Kanneh said that in the event a veteran enrollee withdraws from one of Atius's programs, the remaining costs are subtracted from the invoice and the funds are returned to the VA.

    e.    Shodiya said attendance is taken each day and an attendance roster is maintained. Shodiya said emails are sent each week to James King with an attached copy of the attendance roster. In addition, he said reports are sent to King to indicate the veterans' progress in each course.

    f.    The Virginia Atius location has a total of five instructors. Poawui said each instructor has 7 to 10 years of experience working in the Information Technology field and they are certified to provide classroom instruction.

36.    On August 23, 2017, a site visit was conducted by a VR&E Program staff member at Atius Technology Institute located at 4715 Sellman Road, Suite G, Beltsville, Maryland 20705. The following information was gathered during this site visit:

a.   The VR&E Program staff member met with Albert Poawui, Jacob Shodiya and Sombo Kanneh.  They each described their role at Atius.  Poawui identified himself as the owner, Shodiya identified himself as the program director, and Kanneh indicated she was responsible for bookkeeping and recordkeeping.

b.   The VR&E Program staff member was provided a tour of the school where s/he observed three classrooms with tables and multiple computers.

c.   Poawui reported that Atius offers four training programs including Network Engineer, Cybersecurity Analyst, Database Administration, and Project Management Professional.  Poawui said all of the training programs are 18 months or less in length.

d.   Shodiya said students at Atius are administered a quiz at the beginning of each course and they are administered an examination and capstone project after three to four weeks of attendance in each course.

e.   Shodiya said attendance is taken each day and an attendance roster is maintained.  Shodiya said emails are sent each week to James King with an attached copy of the attendance roster.  In addition, he said reports are sent to King to indicate the veterans' progress in each course.

f.   Poawui said the Maryland Atius location has a total of seven instructors. Poawui said he recruits individuals that have decades of experience.

37.   On October 12, 2017, a site visit was conducted by VR&E Program staff at Atius Technology Institute located at 4715 Sellman Road, Suite G, Beltsville, Maryland 20705.  The following information was gathered by VR&E Program staff during this visit:

a.     VR&E Program staff arrived on site at 9:40 a.m. and remained on site for approximately 1 hour and 50 minutes.  No students were observed inside the school during this visit.

b.     Albert Poawui said that in 2015, VR&E Counselor J.B. assisted him with getting Atius approved to receive VR&E benefits.  In September 2015, when J.B. left his/her employment at the VA, Poawui began working exclusively with James King.

c.     Poawui reported that Atius offers four training programs including Network Engineer, Cybersecurity Analyst, Database Administration, and Project Management Professional.  Poawui said each program track takes an average of 18 months to complete with 18 to 20 clock hours per week being invoiced as full-time attendance.  Atius staff reported that they have a 100% success rate for student employment upon completion of their program.

d.     Atius staff said they have a total of 126 students attending their Maryland and Virginia locations and 46% to 50% are veteran enrollees whose tuition is being paid by the VA.  Poawui reported that a total of 13 veteran enrollees have graduated from Atius.

e.     Atius did not have a published catalog or any material concerning the school's refund policy, student attendance, and student progress.

f.     Atius staff said a student's progress is based on a pretest and posttest to evaluate the student's gained knowledge.  The staff said that a student will receive a certificate of completion once s/he has completed assignments and in-class examinations with an average of 70% percent or above.  Poawui said the

certificate of completion has no real value as the student must pass an industry standard certification to become marketable in the field for which the training was provided.  Atius staff noted that some veteran enrollees decided not to take certain certifications and a few others were unable to pass the certification examinations despite receiving training at the school for 18 months.

g.  Atius staff noted that in the past they did not have a standard procedure to track attendance.  They said they recently informed students that they were required to attend classes and just started requiring students to sign an attendance roster despite the fact that Jacob Shodiya indicated during the previous site visit that the school was taking attendance.

h.  Atius staff provided an invoice for VR&E veteran enrollee J.G. who they said never attended the school despite the fact that they billed VA and accepted payment from VA for J.G.'s complete training program.  Atius staff said they emailed the local VR&E staff to notify them of some VR&E veterans who withdrew from the program but it was noted that VA documentation does not support that Atius notified the local VR&E staff of the change in enrollments. In addition, as of the date of this site visit, J.G. was still receiving subsistence allowance payments.

i.  Poawui said invoices submitted to the VA from May 2017 to present have not been paid due to a review being conducted by VR&E Program staff.  Atius staff said that as a result, the school was experiencing difficulty purchasing student books for their current students and they were using outdated training materials. Atius staff reported that daytime instruction was cancelled due to lack of

funding from the VA and they now only have evening and weekend training available. However, VR&E staff note that the VA had already paid for equipment, textbooks, and other supplies for the vast majority of the currently enrolled veterans as this is done at the time a veteran is enrolled in the program.

j.      Poawui reported that many veteran enrollees prefer to attend evening classes because they work during the day. VR&E Program staff note that if a veteran has suitable employment, s/he would likely not qualify for educational assistance under the VR&E Program.

k.      Atius staff showed VR&E staff a limited set of paper records reflecting student files and attendance, in addition to a limited set of records on a laptop computer. However, Atius staff was unable to provide all of the invoices requested by VR&E Program staff during the site visit. In addition, invoices that were provided to VR&E Program staff appear to show that the school had double-billed the VA.

38.      On November 15, 2017, VA-OIG conducted a review of veteran J.G.'s record within VR&E's electronic system following receipt of the site visit report indicating that Atius staff acknowledged that J.G. never attended the school. The records show a note entered by James King concerning J.G.'s progress at Atius. The note states, "Spoke to vet regarding progress being made towards obtaining the next cert. Vet states the next exam is forth coming in the next month or so and that he is confident that he will pass it."

39.      On August 23, 2017, a site visit was conducted by VR&E Program staff at Eelon located at 3100 Branch Avenue, Suite 207, Temple Hills, Maryland 20748. The following information was gathered by VR&E Program staff during these site visits:

a.      A VR&E Program staff member scheduled this site visit with Michelle Stevens in advance.  The VR&E staff member arrived at approximately 12:00 p.m. and stayed on site for approximately 20 minutes.  Upon arrival, the VR&E Program staff member was greeted by an individual who identified himself as Robert Stevens.  Mr. Stevens notified the staff member that Michelle Stevens was on a book tour and would not be present for this visit.  Mr. Stevens identified himself as the school's facilitator.

b.      The VR&E staff member noted that the building was dirty, the wall tiles and air conditioning system were in need of repair, and it was not Americans with Disabilities Act (ADA) compliant.   Mr. Stevens brought the VR&E staff member to a classroom and attempted to provide him/her with a presentation about the school's program but he was unable to get the audio to work on his computer.

c.      Mr. Stevens noted that there were a total of eight students enrolled at the school and all of them were enrolled in the digital production course.  Mr. Stevens said students have the option of logging in virtually when needed despite the fact that all materials provided to the VA indicated that the school did not offer online courses.   Mr. Stevens said the school operates Monday through Friday and classes are held from 4:30 p.m. to 10:30 p.m. each day, except Wednesdays which are considered half days.

d.      During the visit, the VR&E Program staff member observed only one video camera at the school which s/he described as appearing to be approximately 20

years old.   In addition, the VR&E Program staff member observed no equipment or materials at the school related to massage therapy.

e.   The VR&E Program staff member observed one individual at the school who identified himself as a student.   However, the VR&E staff member never saw this individual receiving instruction from anyone while s/he was on site.   No other students were observed on site during this visit.

40.     On October 12, 2017, a site visit was conducted by VR&E Program staff at Eelon located at 3100 Branch Avenue, Suite 207, Temple Hills, Maryland 20748.   The following information was gathered by VR&E Program staff during this visit:

a.   VR&E Program staff conducted an unannounced site visit and arrived at approximately 1:30 p.m.   Upon arrival, VR&E Program staff asked for Michelle Stevens and the receptionist left the front desk.   Several minutes later, an unidentified male greeted VR&E Program staff and said Stevens was not at the school at that time.   The male offered to take VR&E Program staff on a tour of the building.   VR&E Program staff noted that the building was "filthy" and not conducive for an effective training environment, it was not ADA compliant, and the air conditioning was in need of repair.

b.   The male employee indicated that the school offered "video editing training." The male employee showed VR&E Program staff an area utilized for video editing related training.   In this room, there was a male who VR&E Program staff estimated to be 80 to 90 years old who was sitting in a chair in front of video camera.   The male employee introduced the man as a Vietnam War veteran.

27

c.      The male employee told VR&E Program staff that all of the veteran enrollees whose tuition was being paid by VA were enrolled in a video editing program which was a 100% online course.  In addition, he said no veteran students were enrolled in the massage therapy training.

d.      VR&E Staff noted that there were doors inside the facility which were padlocked.  The male employee made an attempt to unlock one of the doors but he was having difficulty.  At that time, VR&E Program staff notified the male employee that they would end their site visit as Stevens was not present to provide them with any further information.

e.      Upon exiting the building, VR&E Program staff noticed that the male employee followed them to the parking lot.  The male employee said Stevens was on the telephone and was requesting to speak with VR&E Program staff.  A VR&E Program staff member received the telephone from the male employee and introduced herself to Stevens.  Stevens asked the VR&E Program staff member if she had visited the school to get a massage.  The VR&E Program staff member summarized the purpose of the visit and noted that s/he would follow up with Stevens at a later point, if needed.

f.      VR&E Program staff indicated that they observed only one video camera at the school and they observed no other equipment or materials related to digital media production.  In addition, the VR&E Program staff observed no equipment or materials at the school related to massage therapy.

41.    Following the October 12, 2017 site visit at Eelon, VR&E Program staff conducted a review of files for veterans who enrolled at Eelon.  This review determined that two of the eight

veterans who enrolled at Eelon were employed at the time they had their initial meeting with James King to determine if they were eligible for VR&E Program benefits. VR&E Program staff note that if a veteran has suitable employment, s/he would not be eligible to receive tuition to Eelon or any other VR&E contract school.

42.     In his position as a VR&E Program Counselor, James King is required to complete a Confidential Financial Disclosure Report. On February 25, 2016, King completed this report and he indicated that he did not have any employment outside of his government position. King was required to complete this report again in February 2017, but VA records show that he has not yet completed it. VA Office of General Counsel records were reviewed for any information indicating that King requested a consultation to discuss outside employment but no records of this kind could be found.

### Review of Non-VA Records

43.     Bank records for accounts belonging to James King, Albert Powaui, Atius, Michelle Stevens, Eelon, Francis Engles, and Engles Security were obtained. A review of these records revealed the following:

a.      From April 2015 to February 2017, King made 22 cash deposits into three of his bank accounts which totaled over $40,000.

b.      From March 2015 to March 2017, over $710,000 in cash was withdrawn from accounts associated with Atius and Poawui.

c.      From August 2016 to March 2017, over $28,000 was withdrawn from accounts associated with Eelon and/or Michelle Stevens. Approximately $22,000 was withdrawn from these accounts on September 6, 2016. While it has been confirmed that some of these were cash withdrawals, agents are awaiting

additional documents from the banking institution to confirm that all of these transactions were cash withdrawals.

d.     From July 2015, to February 2017, over $40,000 in cash was withdrawn from accounts associated with Francis Engles and Engles Security.

44.     Records were obtained from Nationwide Nissan relating to a recent vehicle purchase made by James King on December 21, 2016.  The records indicate that King paid $30,000 in cash for the purchase of a 2016 Nissan Maxima.

45.     In August 2017, subscriber and historical toll data was obtained for telephone number 240-510-6873.  According to T-Mobile telephone number 240-510-6873 is subscribed to by King with an address of 2608 W. Patapapsco Ave, Baltimore, MD 21230-2791. Telephone number 240-510-6873 is King's personal cellular telephone number associated with a personal cellular telephone device.  On October 23, 2017, a pen register order for telephone number 240-510-6873 was authorized by United States Magistrate Judge for the District of Columbia Deborah A. Robinson.

46.     In August 2017, federal agents employed with VA OIG and FBI conducted a review of Atius's website. During the review, investigators identified Atius point of contact Information Technology Academy Director: Albert Poawui with telephone number 240-413-6420.  On September 6, 2017, federal agents conducted a consensually recorded, outgoing telephone call with telephone number 240-413-6420. Poawui answered the telephone call and identified himself and his affiliation with Atius. Subscriber information associated with telephone number 240-413-6420 has been subpoenaed, however the results have not yet been provided by the service provider.

47.     Based on analysis of telephone records and pen register data for 240-510-6873, King used telephone number 240-510-6873 to communicate with telephone number 240-413-6420

on 188 occasions from August 2016 through November 2017 and as current as November 24, 2017.  Of those 188 total communications, 24 were via sms/text message.  Records show that on December 20, 2016, the day before King makes the cash vehicle purchase, King's telephone number 240-510-6873 received two calls and one sms/text message from telephone number 240-413-6420.  In addition, King used telephone number 240-510-6873 to communicate with telephone number 240-413-6420 at least one time on December 21, 2016, the date King made the cash vehicle purchase.

48.     VA records indicate that telephone number 240-241-2490 and 301-875-6567 are associated with Michelle Stevens and Eelon.  James King used telephone number 240-510-6873 to communicate with telephone number 240-241-2490 on approximately 67 occasions from August 2016 through April 2017.  Of those 67 total communications, 28 were via sms/text message.  James King used telephone number 240-510-6873 to communicate with telephone number 301-875-6567 on approximately 66 occasions from November 2017 through December 2017.  Of those 66 total communications, 61 were via sms/text message.

49.     VA records indicate that telephone number 240-305-6056 is associated with Francis Engles and Engles Security.  Based on analysis of telephone records and pen register data for 240-510-6873, James King used telephone number 240-510-6873 to communicate with telephone number 240-305-6056 on approximately 164 occasions from August 2016 through March 2017.  Of those 164 total communications, 22 were via sms/text message.

**Witness Interviews: Atius**

50.     On February 27, 2017, VA OIG agents conducted an interview of VR&E Officer C.S.  C.S. stated that in January 2017, s/he called Atius from his/her VA telephone.  Albert Poawui answered the telephone and immediately said, "Hello, Mr. King" indicating to C.S. that Poawui

and James King are in regular contact by telephone.  C.S. questioned Poawui about one instance where he double-billed the VA and Poawui told him/her that "must be a mistake."  C.S. questioned Poawui about his splitting of costs between multiple invoices and Poawui said King directed him to do this so that King would not have to complete the high cost memorandums.

51.     On April 4, 2017, VA OIG telephonically contacted VR&E Counselor K.M. During this call, K.M. said that in March 2017 she received numerous Educational and Vocational Counseling assessment applications and she was tasked with setting up appointments with these veterans.  One of the assessment applications related to veteran J.H., and K.M. set up a meeting with him/her on March 24, 2017.  During this meeting, J.H. said s/he thought s/he had applied for entrance into the VR&E Program.  J.H. said s/he never submitted an application and instead stated, "That was done for me."  J.H. said s/he received an email from a VR&E counselor who said J.H. could receive free Information Technology training at Atius and J.H. would receive a stipend during the time s/he was enrolled.  J.H. declined to provide the name of the VR&E counselor who sent him/her the email.  K.M. told J.H. that s/he was aware of some local free Information Technology classes and s/he could assist J.H. with signing up.  J.H. said s/he was not interested in these courses if s/he was not going to receive a stipend.

52.     On May 8, 2017, VA OIG conducted an interview of J.R., Financial Clerical Assistant, National Capital Regional Benefit Office, Washington, D.C.  On May 3, 2017, J.R. reviewed six VR&E invoices from Atius which individually totaled approximately $60,000.  J.R. was concerned about the high cost especially given the fact that this is a non-college degree school. On May 4, 2017, J.R. made a telephone call to Atius.  A man answered the telephone and J.R. said s/he was interested in enrolling at the school.  The man said the school offers a non-accredited cybersecurity program.  The man asked if J.R. was a veteran and J.R. said s/he was not.  The man

said if J.R. was not a veteran, the cost of the program would be $14,000.  The man said he could

also offer a payment plan where J.R. would pay $500 per month and the total cost of the course

would be $8,000.  The man said if J.R. obtained a loan, the program would only cost him/her

$6,000.  The man did not explain why the cost of the course decreased with the payment plan and

the loan.

53.     On May 9, 2017, VA OIG conducted an interview of M.T., Financial

Administrative Specialist, National Capital Regional Benefit Office, Washington, D.C.  M.T. said

James King approved multiple invoices received from Atius.  Upon King's approval, the invoices

were sent to M.T.'s office for review before payment.  M.T. noticed that the invoices were very

high in price.  M.T. said James King has a pattern of calling him/her to inquire about invoices that

have not yet been paid.  While other VR&E counselors send an email to the finance mailbox, King

is the only VR&E counselor who has called M.T. directly to discuss payment of an invoice.  On

May 4, 2017, M.T. used his personal cellular telephone to call Atius.  M.T. said a male picked up

the telephone and he thought this person identified himself as "Ali."  M.T. expressed interest in

enrolling at the school.  The man asked if M.T. was a veteran and M.T. said s/he was.  When M.T.

asked how much the program would cost, the man asked, "Who is your Voc Rehab Counselor?"

M.T. told the man s/he was not in the VR&E Program.  The man said he usually enrolls veteran

students in 9 classes and he charges the VA approximately $53,000 for each veteran.  The man

told M.T. he could enroll him/her in five classes and charge him/her between $14,000 and $15,000.

54.     On June 6, 2017, federal agents employed with VA OIG conducted an interview of

E.T., a current veteran student at Atius.  Prior to this interview, VA-OIG conducted a review of

VA records pertaining to E.T.'s enrollment at the school.  E.T. was enrolled in an educational

program at Atius beginning in January 2017 and ending in August 2018.  VA records showed that

Albert Poawui signed an enrollment certification document indicating to the VA that E.T. was enrolled in and attending classes at the school for 24 hours per week for a total term of 20 months. During the interview, E.T. stated the following:

    a.     E.T. is a veteran of the U.S. Army and currently employed in the Transportation Office at Fort Belvoir.

    b.     In January 2016, E.T. applied and was accepted into the VR&E Program.  In March 2016, E.T. attended the VR&E orientation in Washington, DC and met with a VR&E counselor.  At this time, E.T. discussed his/her desire to complete an accounting program.  This VR&E counselor assisted E.T. with enrolling in an accounting program at DeVry University.  DeVry University is a school assigned to James King and as a result, E.T.'s VR&E Program file was transferred to King.

    c.     E.T. met with King and expressed his/her interest in accounting.  E.T. said King knew s/he was already enrolled at DeVry University and would be starting classes there shortly.  King told him/her that he reviewed his/her educational transcripts and he noticed s/he had failed a couple of classes.  King told E.T. s/he should instead pursue Information Technology training at Atius.  King told him/her the school had a great success rate and this would be a fast track to a high paying job.  Despite the fact that E.T. had no interest in Information Technology, s/he agreed to enroll at the school based on the information James King provided.

    d.     E.T. attended classes at Atius's Virginia location.  In March 2017, E.T. started the CompTIA A+ course at the school.  E.T. did not know the exact dates of

his/her enrollment, s/he did not know the cost of the tuition and s/he did not know that it was reported to the VA that s/he was attending classes for 24 hours per week. E.T. said the CompTIA A+ course lasted approximately four weeks and during that time, she was present at the school for a total of approximately 18 hours. E.T. said there were a total of 11 students in her CompTIA A+ course and they all attended class at the same time and completed the same number of hours. E.T. said there may have been a few non-veteran students in her class but the vast majority of the students were veterans who had been sent to the school by King. E.T. was not aware of any veterans enrolled at Atius who were not sent to the school by King.

e.      E.T. reported that Atius was not a legitimate school. E.T. said the entire curriculum was taken from YouTube videos where an individual named Professor Messer talks about Information Technology. E.T. said that upon completing the CompTIA A+ course, s/he did not have enough knowledge of the subject matter to even attempt to take the examination to obtain his/her certification. E.T. said no one in his/her class had enough knowledge of the subject matter to pass the certification examination. E.T. said only one of the 11 students in his/her class attempted the certification examination and this person failed.

f.      In approximately May 2017, E.T. started the CompTIA Network+ class at Atius which was supposed to end in approximately June 2017. E.T. did not know the exact dates of his/her enrollment, s/he did not know the cost of the tuition and s/he did not know that it was reported to the VA that s/he was attending classes

for 24 hours per week.  E.T. said this class had previously been cancelled twice. E.T. attended this class on three occasions and s/he was present at the school for three hours on each of these days.  E.T. said the instructor read straight from a textbook during each of these classes and s/he received no practical training.

g.  E.T. confirmed that the VA paid to Atius his/her tuition and that s/he received a monthly subsistence allowance from the VA during the time s/he was enrolled at the school.

55.  On November 17, 2017, federal agents employed with VA OIG and FBI conducted an interview of S.E., a veteran student currently enrolled at Atius.  Prior to this interview, I conducted a review of VA records pertaining to S.E.'s enrollment at the school.  S.E. was enrolled in an educational program at Atius beginning in March 2017 and ending in December 2019.  VA records showed that Jacob Shodiya signed an enrollment certification document indicating to the VA that S.E. was enrolled in and attending classes at the school for 24 hours per week for a total term of 26 months.  During the interview, S.E. stated the following:

a.  S.E. is a veteran of the U.S. Air Force and currently employed with HANNA, a government contractor.

b.  In approximately October 2016, S.E. applied and was accepted into the VR&E Program.  S.E. attended the VR&E orientation in Washington, D.C. and met with King, who was assigned as his/her VR&E counselor.  At this time, S.E. discussed with King his/her desire to complete his/her bachelor's degree in Industrial Technology as s/he needed only eight additional credits.  King suggested that S.E. attend Atius for Information Technology training.  King told S.E. that he had sent other veterans to this school.  King said that upon

completing the program, these veterans obtained Information Technology certifications and secured employment with annual salaries greater than $100,000. King told S.E. that s/he would be able to complete the Information Technology training and obtain the certifications within one year. King said S.E. could complete his/her bachelor's degree after his/her training at Atius. S.E. agreed to enroll in the program because at the time, s/he believed King had his/her best interests in mind.

c.       S.E. attended classes at Atius's Virginia location. In March 2017, S.E. started the CompTIA A+ course at the school. S.E. did not know the exact dates of his/her enrollment, s/he did not know the cost of the tuition, and s/he did not know it was reported to the VA that s/he was attending classes for 24 hours per week. The CompTIA A+ course lasted approximately one to one and a half months and S.E. was present at the school for a total of six hours each week. S.E. said there were a total of approximately 11 students in his/her CompTIA A+ course and they all attended class at the same time. S.E. believed that all of the individuals in his/her class were veterans who were sent to Atius by King.

d.       S.E. said that upon completing the CompTIA A+ course, s/he did not have enough knowledge of the subject matter to even attempt to take the examination to obtain his/her certification. S.E. said no one in his/her class had enough knowledge of the subject matter to pass the certification examination. S.E. said that his/her conversations with students in his/her class revealed that no one was aware of anyone who was able to obtain Information Technology certifications following their training at Atius.

e.     In approximately May 2017, S.E. started the CompTIA Network+ class at Atius. S.E. did not know the exact dates of his/her enrollment, s/he did not know the cost of the tuition, and s/he did not know it was reported to the VA that s/he was attending classes for 24 hours per week. S.E. attended this class for a total of six hours each week. S.E. said the instructor was not "instructor quality" as s/he was not prepared and not well spoken. Two to three weeks into the class, students complained that the instructor was not providing learning materials or satisfactory instruction. In addition, S.E. said s/he did not recall the instructor ever administering examinations to the class. Around this time, Sombo Kanneh told veteran students that the course was suspended because VA was no longer paying the school for training. In September 2017, Atius notified students that the CompTIA Network+ course was no longer suspended but S.E. was one of only a few students who returned to class. S.E. said the new instructor did not administer any examinations to students. S.E. attended this class until November 6, 2017. At that time, s/he stopped attending because s/he did not believe s/he was benefiting from the training. S.E. summarized his/her experience at Atius by saying, "I wasted two years of my life doing nothing."

f.     At the time of S.E.'s initial meeting with King, S.E. thought King had his/her best interests in mind. However, after attending Atius and recalling his/her meetings with King, S.E. ultimately felt that King "herded" him/her toward the school. When asked about King's relationship with Atius, S.E. stated that s/he had the feeling that King was a salesman trying to sell his company.

g.    S.E. was provided documents to review from his/her VR&E file including the Rehabilitation Plan document and the Rehabilitation Guidelines and Debt Prevention document.  S.E.'s name was signed on both forms.  S.E. said s/he had never seen these documents before and s/he never signed these documents.

h.    S.E. confirmed that the VA paid to Atius his/her tuition and that s/he received a monthly subsistence allowance from the VA during the time s/he was enrolled at the school.

56.    VA OIG made contact with S.E. by telephone on November 22, 2017.  A VA OIG agent read a note to S.E. that was entered by King in S.E.'s record within VR&E's electronic system.  The note stated, "Spoke to vet regarding progress being made towards obtaining the next cert. Vet states the next exam is forth coming in the next month or so and that he is confident that he will pass it."  S.E. said s/he did not recall ever having a conversation like this with King.  S.E. said he never felt confident about passing examinations at Atius because he did not receive proper instruction to prepare him for those examinations.

57.    On November 29, 2017, a federal agent employed with the FBI and working in an undercover capacity placed an outgoing telephone call to a number known to be associated with Albert Poawui.  An unknown male answered the telephone call and the undercover agent asked to speak with Poawui.  Following a brief hold, Poawui identified himself and his affiliation with Atius.  Poawui stated that Atius would be starting CompTIA A+ and CompTIA Network+ courses in January 2018.  Poawui stated that Atius was closing their Springfield, Virginia campus.  Poawui stated that a start date for the courses would be announced mid-December 2017. After further discussion of the CompTIA Network+ course and an IT/cyber career path, Poawui stated that Atius

may also be closing their Beltsville, Maryland campus.  Poawui stated that Atius was currently waiting on "resources" and may have to close the Beltsville campus should it not receive them.

58.     On December 12, 2017, federal agents employed with VA OIG and FBI conducted an interview of Albert Poawui.  During this interview, Poawui stated the following:

    a.    In 2015, Atius was approved to receive VR&E Program benefits and the school was assigned to VR&E Counselor J.B.  In approximately late 2015, J.B. left her employment at the VA, and the school was transferred to James King.

    b.    In approximately late 2015, soon after Atius was transferred to King, King regularly asked Poawui to meet with him at King's office at the VA.  When Poawui received these requests, he thought King wanted to discuss matters related to Atius's business with the VA.  On four or five occasions, Poawui met with King at King's VA office.  Instead of discussing matters related to Atius's business with the VA, King told Poawui about his personal financial troubles.  Poawui recalled that King said he was having difficulty making child support payments.  During the fourth or fifth meeting with King during which King discussed his financial troubles, Poawui realized that King was indirectly asking Poawui to pay him.

    c.    During the fourth or fifth meeting at King's VA office, Poawui agreed to pay King a "referral fee."  Pursuant to this agreement, King received seven percent of each check that Poawui received from the VA.  King agreed to enroll all veterans who wanted to pursue Information Technology training at Atius and King agreed to not enroll these individuals at any other Information Technology school.

40

d. Poawui estimated that from approximately late 2015 to sometime between March and May 2017, he paid King between $150,000 and $250,000.  At King's request, Poawui made the majority of the payments to King in cash, but he also recalled making one or two payments to King using Google Wallet.  Poawui said King stressed that he wanted cash payments because he did not want to report this income on his tax return.

e. King would monitor the VA system to make sure invoices to Atius were paid, and then would contact Poawui for payment.  Poawui withdrew the cash to pay King from a Bank of America branch in Maryland.

f. On multiple occasions, Poawui delivered cash payments to King at King's residence.  Poawui described King's residence as an apartment located in Baltimore, Maryland.  In addition, King visited Atius to retrieve these cash payments.  King also sometimes sent a veteran, J.K., to retrieve payments on his behalf.

g. Poawui said he reported on VA Forms 28-1905 that all veteran students were enrolled full-time at Atius and they were attending classes for at least 18 hours per week.  However, Poawui admitted that he was only aware of one veteran who attended classes for at least 18 hours per week.  Poawui stated that all of the other veterans were attending class for less than 18 hours per week.

**Witness Interviews: Engles Security**

59. On April 10, 2017, federal agents employed with VA OIG conducted an interview of E.A., a former veteran enrollee at Engles Security.  Prior to this interview, I conducted a review of VA records pertaining to E.A.'s enrollment at the school.  E.A. was enrolled in an educational

program at Engles Security beginning in June 2016 and ending in December 2016.  During the interview, E.A. stated the following:

a.  E.A. is a veteran and s/he currently works at a bakery in Maryland.

b.  In approximately March 2016, E.A. met with a VR&E counselor and expressed that s/he wanted to pursue a career in the culinary field.  E.A. provided the VR&E counselor with an application for entrance into the VR&E program and in approximately April 2016, E.A. received a letter from VA indicating that s/he was accepted into the VR&E program.

c.  On approximately June 6, 2016, E.A. attended the VR&E orientation and following this presentation, s/he met with James King.  During this meeting, E.A. told King s/he wanted to attend L'Academie de Cuisine, a culinary school in Maryland.  The next course at this school did not start for several months and King told E.A. that if s/he did not take another course before the culinary school started, King would have to close E.A.'s VR&E file.  King told E.A. he would sign him/her up for a security guard training program offered at Engles Security.  E.A. told King that s/he has back pain and other physical issues which would make working as a security guard very difficult.  E.A. also told King that s/he was going to be in the Philippines for 25 days during the time King was suggesting s/he attend the security guard training program.  King told E.A. that the owner of Engles Security would be willing to work with E.A.'s schedule.  E.A. was suspicious of King when he told him/her the school would be able to accommodate his/her schedule.  However, E.A. did not want King to close his/her file so s/he went along with this plan despite his/her concerns.

d.      In July 2016, E.A. visited the school for the first time.  On this day, s/he was greeted by a receptionist who told him/her the roof was leaking and the receptionist sent him/her home.  E.A. did not receive any training on this date and E.A. did not see any other students at the school on this day.  In mid-July, soon after this visit, E.A. left on his/her trip to the Philippines.

e.      Upon returning from the Philippines on August 16, 2016, E.A. visited the school for the second time.  On this day, there were no other students present. The receptionist provided E.A. with a piece of paper which read, "Monday, Tuesday, Wednesday, Thursday, Friday."  The receptionist directed E.A. to sign next to each of these days and s/he did as she asked.  E.A. left the school after being inside about ten minutes.  E.A. never received any training on this day.

f.      Soon after the second visit, E.A. visited the school a third time.  On this day, the receptionist again provided him/her with a piece of paper which read, "Monday, Tuesday, Wednesday, Thursday, Friday."  The receptionist told E.A. to sign next to each of these days and s/he did as she asked.  E.A. left the school after being inside about ten minutes.  E.A. never received any training on this day.  E.A. realized the receptionist was telling him/her to sign this document to indicate that s/he had attended training on these days despite the fact that s/he had never received any training at this school.

g.      Soon after E.A.'s third visit, s/he visited the school for the fourth time and there was one other student present.  On this day, E.A. met with Francis Engles who told E.A. s/he needed "three perfect days of training" from E.A. in order to complete the course.  E.A. said Engles provided him/her with a packet of typed

papers which s/he noted contained many grammatical errors.  E.A. said s/he never received any training on this day and this was the last time s/he visited the school.

h.      When asked about Engles Security's operating hours, E.A. said there did not seem to be specific class hours.  E.A. said this was not an organized school with a specific course start date and end date.  E.A. noted that s/he never took any tests and s/he never received any certificates of completion from the school.

i.      E.A. said s/he knew VA paid approximately $18,000 for what was supposed to be a three month course at Engles Security.  E.A. said that after visiting Engles Security, s/he knew it was not a legitimate school.  E.A. confirmed that s/he received a monthly subsistence allowance from the VA during the time s/he was enrolled at the school.

**Consensually Monitored Conversation Between King and Poawui**

60.     On December 13, 2017, Poawui had a consensually monitored meeting with King at a Buffalo Wild Wings in Hanover, Maryland.  Following the meeting, an FBI agent and I met with Poawui.  At this time, Poawui provided a brief summary of his conversation with King, including the following details:[1]

61.     King and Poawui discussed the investigation being conducted by agents employed with VA OIG and FBI.  King showed Poawui a subpoena he received from federal agents.  King told Poawui that he was interviewed by federal agents and he told them he did not receive any

---

[1] The video and audio recordings from this meeting are currently being processed by the FBI and analyzed by a filter team to ensure that the investigative team does not gain exposure to any information potentially subject to the attorney-client privilege.  Therefore, I have not yet seen or listened to the recordings.

payments from Poawui.  King told Poawui that when he is interviewed by federal agents, Poawui should tell them that he did not make any payments to King.

62.     Poawui asked King about any records he may have of his previous conversations with Poawui which related to the matters being investigated by federal agents.  King told Poawui he deleted text messages he exchanged with Poawui.

63.     Poawui reminded King of the last time he made a cash bribe payment to King around April 2017.  King acknowledged this statement as being true by saying to Poawui, "Mhm." Poawui thought King may have also nodded his head in agreement.

64.     King told Poawui that he was worried about what information federal agents might obtain regarding a school named "Engles Security."  King explained that he and the owner of Engles Security no longer have a friendly relationship.

65.     King told Poawui he spoke with the owner of a school named "Eelon" on December 12, 2017, and the owner of Eelon told King that federal agents had not interviewed her yet.

**Additional Probable Cause Related to the Subject Premises**

66.     King has used the SUBJECT PREMISES as his office since 2013, before the inception of the conduct described in this affidavit.

67.     Each VR&E counselor is assigned a computer which is used for official VA business, to include communications with businesses that contract with the VA, veterans that receive VA services, and other VA staff members.  One such laptop computer is located within the SUBJECT PREMISES and has been used by King to conduct official VR&E business.

68.     VR&E counselors such as King store both electronic and paper records in their office space.  Included among such records are submissions to the VA by VA contractors, vouchers

related to payments by the VA to such contractors, personnel files of veteran students, and other records related to VA business.

69.     On December 11, 2017, King was given a termination of employment letter by the VA.  After receiving the termination letter, King had the opportunity to, and did, remove from his office any items he deemed to belong to him personally.  I watched King place several personal items in a bag before he left the office.

## TECHNICAL TERMS

70.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not

limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

       3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

       b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning

system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

       c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

       d.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

       e.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

f.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

h.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

71.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include

any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the SUBJECT PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a. Individuals who engage in criminal activity, including violations of the Specified Federal Offenses, use digital devices, like the Device(s), to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device(s), documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of

illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

      b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet

pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

72.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes

on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be

sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f. I know that when an individual uses a digital device to engage in fraudulent billing and false statements, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

73. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence

of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.

A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

        e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected

time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

74. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a. Upon securing the SUBJECT PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices, within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the SUBJECT PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed

to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.      In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## REQUEST FOR SEARCH WARRANT

75.      Based upon the foregoing, I submit that probable causes exists to believe that James King is using the SUBJECT PREMISES to commit the Specified Federal Offenses, and that computers, computer storage media, printers, scanning devices, and memory devices, and other physical evidence, contraband, fruits, and instrumentalities of the Specified Federal Offenses, may be found at the SUBJECT PREMISES.  I respectfully request authority to search the entire premises, including the commercial premises and any computers, computer storage media, printers, scanning devices, or memory devices, located therein, where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as evidence, contraband,

fruits and instrumentalities, as well as any other evidence, contraband, fruits and instrumentalities

of the Specified Federal Offenses.

Respectfully submitted,

_____
Katie O'Neil
Special Agent
Department of Veterans Affairs, Office of
Inspector General

Subscribed and sworn to before me this _____ day of December, 2017

_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**DESCRIPTION AND PHOTOGRAPH OF 1722 I STREET NW, SUITE 201,
WASHINGTON, DC 20006:**

1722 I Street NW, Suite 201, Washington, DC 20006 is located inside a nine-story
federal government office building that is comprised primarily of glass windows with brown
colored material between each row of windows.  The address "1722 I Street" is affixed above the
two glass front doors.  Suite 201 is located on the second floor of the building and there is a sign
for "Vocational Rehabilitation and Employment (201)" affixed to the right side of the suite door.
Upon entering the glass door of the suite and walking to the right of the receptionist's desk,
James King's office is the fourth office on the right.  King's office door has a vertical window to
the right of the silver door handle and there is a glass panel above the door.  There is a sign
affixed to the left of the office door which reads, "James King Vocational Rehabilitation
Counselor."



**ATTACHMENT B**

**List of Items to Be Searched and Seized**

1.       Any and all documents, records, communications, and items relating in any manner to violations of the Specified Federal Offenses committed by owners or employees of Atius Technology Institute ("Atius"), Eelon Wellness and Massage/Eelon Training Academy ("Eelon"), Engles Security Training School ("Engles Security") and/or James King from December 14, 2014, to the date of this warrant, including the following:

a.   Any document, record, notes, correspondence, or communication reflecting, referring to, Atius, Eelon, or Engles Security;

b.   Any document, photograph, notes, record, correspondence, and/or communication reflecting or referring to employees, independent contractors, interns, and/or volunteers associated with Atius, Eelon, or Engles Security;

c.   Any document, photograph, notes, record, correspondence, and/or communication reflecting or referring to veterans or non-veterans enrolled, formerly enrolled, or seeking to enroll at Atius, Eelon, or Engles Security;

d.   Any document, notes, record, correspondence, or communication reflecting, referring to, or relating communications with veterans enrolled in or seeking to enroll in the Vocational Rehabilitation and Employment Program and/or other VA benefit programs;

e.   Any document, notes, record, correspondence, or communication reflecting, referring to, or relating communications with any entity seeking approval to receive benefits under the Vocational Rehabilitation and Employment Program and/or other VA benefit programs;

f.   Bank records, wire receipts, wire transfer records, and/or any other document or item reflecting receipt or transfer of funds between James King and the owners and operators of any vendor doing business with the Department of Veterans Affairs to include but not limited to Atius, Eelon, and Engles Security;

g.   Financial records and/or documents relating to assets or accounts accessed by James King;

h.   All financial records or files including, but not limited to, payment records, receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, safety deposit box and keys, promissory notes, deposit slips, check stubs, state and federal income tax returns, and any other financial records associated with James King and/or the owners and operators of Atius, Eelon, and Engles Security;

i.   Any document, record, communication, and item, of any nature, relating to a scheme to defraud the VA;

j.   Any document, record, communication, and item, of any nature, related to the disposition of proceeds of a scheme to defraud the VA.

k.   All cash, financial instruments, and precious metals having a value exceeding $500.

2. Digital devices used in the commission of, or to facilitate, the Specified Federal Offenses, including a scheme to defraud the VA.

3. For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device[[s]]":

   a. evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

   d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

   e. evidence of the times the Device(s) was used;

   f. passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

   g. documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h. records of or information about Internet Protocol addresses used by the Device(s);

i. records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.